VOIGHTMAN & COMPANY *et al. v.* SOUTHERN RAILWAY
COMPANY *et al.*

*(Knoxville.* September Term, 1910.)

1. **CORPORATIONS. Overt act of insolvency indicating assured
insolvency converts assets into a trust for creditors.**

An overt act of insolvency on the part of a corporation indicat-
ing an assured insolvency converts its assets into a trust fund
for the benefit of all its creditors. (*Post, pp.* 457, 460.)

Cases cited and approved: Marr v. Bank, 4 Cold., 471; Moseby v.
Williamson, 5 Heisk., 278; Smith v. Insurance Co., 3 Tenn. Chy.,
502; Smith v. Insurance Co., 6 Lea, 564; Leipold v. Marony, 7
Lea, 128; Comfort v. McTeer, 7 Lea, 652-660; Bank v. Lumber
& Manufacturing Co., 91 Tenn., 12; Publishing Co. v. Car Wheel
Co., 95 Tenn., 634; McClaren v. Roller Mill Co., 95 Tenn., 696;
Smith v. Printing Co., 97 Tenn., 351; Barrel Co. v. Ward, 99
Tenn., 172.

2. **SAME. Same. Assets are converted into a trust fund for
creditors when the corporation has permanently ceased to do
business, or to exercise its franchises.**

One of the tests for fixing the period, or point of time, when the
assets of a corporation are converted into a trust fund for
creditors, is that it has permanently ceased to do business, or
to exercise its franchises. (*Post, p.* 457.)

See citations under the preceding headnote.

3. **SAME. Same. Same. Upon insolvency and ceasing to do bus-
iness, the assets become a trust fund for creditors, and are not
subject to attachment by a creditor so as to give priority.**

Where an insolvent corporation, engaged in constructing build-
ings for a railroad company, was forced to cease business on
account of its operatives and employees refusing to work, and
leaving its service because it did not and could not pay them
for their work, for want of funds and its inability to procure

Voightman v. Railroad.

them, its property then became a trust fund for the benefit of its creditors, and is not subject to attachment by a creditor, so as to give the attaching creditor priority.  (*Post, pp.* 457-459.)

4. **FOREIGN CORPORATIONS.  Local State assets become a trust fund when it becomes insolvent and ceases to do business here, regardless of assets in other States.**

The local State assets of a foreign corporation doing business in this State become, upon the date of its ceasing to do business in the State because of insolvency, a trust fund for its creditors, and the court will not inquire into its property and contract rights in other States.  (*Post, p.* 459.)

Cases cited and approved:  Smith v. Insurance Co., 3 Tenn. Chy., 502; Smith v. Insurance Co., 6 Lea, 564; Leipold v. Marony, 7 Lea, 128.

5. **MECHANICS' LIENS.  Right to fix materialman's lien begins when the last material is delivered under the contract, and the time for acquiring the lien begins to run from that date.**

The right of the furnisher of materials to a contractor, under a contract to be used in constructing a certain building for another to fix his lien for the materials begins when the last material is delivered under the contract, whether it is used in the building or not, and the time for acquiring the lien by filing notice thereof will begin to run from the date of the delivery of the last material.  (*Post, pp.* 460-465, 470-473.)

Cases cited and approved:  Powder Co. v. Railroad, 113 Tenn., 392, 403, 404; Yearsley v. Flanigen, 22 Pa. 489; Harrison v. Homeopathic Association, 120 Pa., 28; Bernsdorf v. Hardway, 7 Ohio Cir. Ct. R., 378; Bridge Co. v. Improvement Co., 12 Wash., 272; See also citations under headnote 6.

6. **SAME.  Same.  Time for acquiring lien is not extended by furnishing material to be used instead of material rejected as defective.**

Where a materialman furnishes material to a contractor, under a contract, to be used in constructing a certain building for another, part of which the owner's inspector, after the delivery

thereof, rejected as defective, the fact that the materialman thereafter furnished additional materials to be used in the place of the alleged defective materials, and so used, did not extend the time for his acquiring a lien for his materials previously furnished under the original contract, but the time for acquiring such lien began to run from the delivery of the last material under said original contract. The fact that the materialman denied that the rejected materials were defective, and furnished the additional material to be charged for, but finally conceded with the contractor that the rejected materials were defective, is immaterial, and does not operate to extend the time for acquiring the lien under the original contract. (*Post, pp.* 459-473.)

Cases cited and approved: Powder Co. v. Railroad, 113 Tenn., 392, 403, 404; Schwab v. Frieze, 107 Mo. App., 553; Brown v. Trane, 98 Wis., 1; Re Brenneman & Ward in Parrish's Appeal, 83 Pa., 111; McKelney v. Jarvis, 87 Pa. 414; Harrison v. Homeopathic Association, 120 Pa., 28, and 134 Pa., 558; Kennebec v. Pickering, 142 Mass., 80; Albright v. Smith, 2 S. D., 577; Manufacturing Co. v. Seminary, 45 Minn., 254; Brick Co. v. Stout, 45 Minn., 327; Chapman v. Wadleigh, 33 Wis., 267. See also citations under headnote 5.

7. **RAILROADS.** What statute applies as to lien for constructing building on railroad line.

The statute (Shannon's Code, sec. 3531, et seq.), giving a lien for work done and materials furnished does not apply to a claim for work done and materials furnished for the construction of a building on the line of a railroad company for use in its business, but the statute (Shannon's Code, sec. 3570, et seq.), creating and regulating the lien of contractors and laborers on railroads, controls. (*Post, pp.* 473, 474.)

Code cited and construed: Sec. 3531, et seq., and sec. 3570, et seq. (S.); sec. 2739, et seq., and sec. 2774, et seq., (M. & V.); sec. 1981, et seq. (T. & S. and 1858),

Acts cited and construed: Acts 1883, ch. 220; Acts 1891, ch. 98.

Voightman v. Railroad.

8. CORPORATIONS. General creditors may object, in a general creditors' insolvency suit, to a claim for a lien on the assets. The general creditors of an insolvent corporation, whose assets are being administered under a general creditors' bill ·for the benefit of creditors, have such an interest in its funds that they may object to a claim of another creditor to participate as a lienor in the assets. (*Post, pp.* 455, 456, 474.)

---

### FROM KNOX.

---

Appeal from the Chancery Court of Knox County. HENRY R. GIBSON, Special Chancellor.

SHIELDS, CATES & MONTCASTLE, for Pittsburgh Plate Glass Co., and all general creditors.

MAYNARD & LEE, for Converse Bridge Co.

CORNICK, WRIGHT & FRANTZ, for Chicago Lumber & Coal Co.

JOUROLMON, WELCKER & SMITH, for Southern Railway Co.

---

MR. JUSTICE NEIL delivered the opinion of the Court.

This in an insolvent proceeding instituted in the chancery court of Knox county to wind up the affairs of the Oliver Sollitt Company, a foreign corporation doing business in Tennessee. The general course of the litiga-

tion in the court below was satisfactory to the parties concerned, and nothing is presented on this appeal except the action of the chancellor on two claims filed by the Chicago Lumber & Coal Company. The first of these is for the sum of $3023.98. This was allowed in the report of the master as a claim, and as entitled to priority of satisfaction out of the amount due the Oliver Sollitt Company from the Southern Railway Company after the satisfaction of certain liens. Exception was filed to this action of the master by other creditors, and the exception was sustained by the chancellor, and the priority of satisfaction disallowed. From this action the Chicago Lumber & Coal Company has appealed to this court and assigned errors.

The claim to priority of satisfaction was based upon a bill which the Chicago Lumber & Coal Company filed in the chancery court of Knox county on the 30th day of October, 1907, against the Southern Railway Company and the Oliver Sollitt Company, where it was sought to attach certain funds alleged to be due the latter from the former. The Oliver Sollitt Company had a contract with the Southern Railway Company to build certain structures on its grounds at Knoxville. At the time of the filing of the attachment proceedings the railway company, as subsequent accounting showed, was indebted to the Oliver Sollitt Company in a sum much more than sufficient to satisfy the demand sued on. On November 4, 1907, the general creditors' bill was filed, and a receiver appointed. Thereafter the bill

Voightman v. Railroad.

of the Chicago Lumber & Coal Company was consolidated with the general creditors' bill.

It is insisted in behalf of the Chicago Lumber & Coal Company that, when its attachment was levied, the Oliver Sollitt Company was a going concern. This is denied by the objecting creditors. They insist that prior to the filing of the bill of the Chicago Lumber & Coal Company there had been an overt act of insolvency on the part of the corporation, indicating such an assured insolvency as converted the assets of the corporation into a trust fund for the benefit of all creditors within our authorities upon that subject, viz.: *Memphis Barrel, etc., Co.* v. *Ward,* 99 Tenn., 172, 42 S. W., 13, 63 Am. St. Rep., 825; *Smith* v. *Bradt Printing Co.,* 97 Tenn. 351, 37 S. W., 10; *Tradesman Publishing Co.* v. *Car Wheel Co.,* 95 Tenn., 634, 32 S. W., 1097, 31 L. R. A., 593, 49 Am. St. Rep., 943; *McClaren* v. *Roller Mill Co.,* 95 Tenn., 696, 35 S. W., 88; *Bank* v. *Lumber & Mfg. Co.,* 91 Tenn., 12, 18 S. W., 400; *Smith* v. *St. Louis M. L. Ins. Co.,* 6 Lea, 564; same case, 3 Tenn. Ch., 502; *Leipold* v. *Marony,* 7 Lea, 128; *Comfort* v. *McTeer,* 7 Lea, 652-660; *Moseby* v. *Williamson,* 5 Heisk., 278; *Marr* v. *Bank of West Tennessee,* 4 Cold., 471.

There are several tests indicated in these cases for the purpose of fixing the period, or point of time, when the assets of the corporation are converted into a trust fund for creditors. One of these tests is that it has permanently ceased to do business, or to exercise its franchises.

The facts shown in the present case are that on the 23d day of October, 1907, the Oliver Sollitt Company was forced to cease doing business upon all of its operatives refusing to work and leaving its service, because it would not pay them for their work. Its failure to pay arose from the fact that it did not have funds and could not procure them. Sufficient funds were owing on the work which had been done for the Southern Railway Company, if due. The latter company refused to pay, because the work had not been completed according to contract. The Oliver Sollitt Company insisted that the work had been done properly. There were four buildings which the Oliver Sollitt Company had undertaken to construct. One of these, the smallest, had been finished. Two others were clearly unfinished. As to the main building, called "No. 1," the machine shop, that was substantially finished; but the railway company insisted it was not wholly finished. The record is not in a condition to enable us to settle this phase of the controversy, because all of it has not been sent up to us; parts having been selected by counsel applicable to that subject. However, this is immaterial. The main point is that, from whatever cause, the Oliver Sollitt Company had in fact ceased work on the 23d of October. There was no employee present on the work, except Mr. Garvey, and he was there only to watch the building and to receive notice of suits which were being brought against the company by the operatives and other creditors. The evidence shows that the company was wholly insolvent. Under these facts, we think the property was a trust

fund, and could not be attached by any creditor so as to give him priority.

It is said that this was a foreign corporation, and that the evidence shows that it had other contracts at Mobile and Birmingham, Ala., and perhaps in other States, and that we cannot know what assets there may be in other States. It is sufficient to say that it is not the duty of the court to inquire into this matter. We must deal with the foreign corporation as we find it here. *Smith* v. *St. Louis M. L. Ins. Co.,* supra; *Leipold* v. *Marony,* supra.

We think there was no error in the decree of the chancellor upon this branch of the case.

The second demand presented by the Chicago Lumber & Coal Company is for $13,831.70, alleged to be the price of a bill of lumber furnished to the Oliver Sollitt Company for use in the construction of the new machine shop, referred to supra as "Contract No. 1." There was a bill filed by the Chicago Lumber & Coal Company on the 31st of October, 1907, in which it was alleged that this sum was a lien upon the property, rights, franchises, roadbed, etc., of the railway company and seeking to enforce said lien. An attachment by garnishment was also levied upon the indebtedness alleged to be due from the Southern Railway Company to the Oliver Sollitt Company to further secure the amount claimed. This suit was likewise consolidated with the insolvency proceeding, and a report made upon this claim by the master. He reported it as a lien both upon the road and the fund, the latter by virtue of the at-

tachment, and the former by virtue of the furnisher's lien. The other creditors excepted to the report. The objections urged were that the Chicago Lumber & Coal Company had taken two notes in settlement of the demand, indorsed by Oliver Sollitt personally, and had thereby waived and lost the lien, if any ever existed, and particularly because the maturity of the notes fell upon a day later than the expiration of the ninety days in which by statute the lien could be fixed by notice upon the property; also that the last item in the bill was furnished March 5, 1907, while the notice claiming the lien was not given until September 10, 1907, or more than ninety days thereafter; also that merely by attaching the money due from the Southern Railway Company to the Oliver Sollitt Company the claimant waived the lien on the property, and that this attachment upon the fund could not be maintained because at and before the levy was made the Oliver Sollitt Company had been guilty of an overt act of insolvency, which converted all of its assets into a trust fund for the benefit of its creditors.

The ineffectiveness of the attachment on the fund is fully shown by what we have said upon the first demand filed by the Chicago Lumber & Coal Company. We need add nothing to what is there said. Moreover, in the view we take of the case, it is unnecessary to refer to any other of the objections made, except that pertaining to the date on which the last item on the bill was furnished.

The Chicago Lumber & Coal Company insists that the last item was furnished June 14, 1907, and that this was within ninety days of the date when the notice of lien was given, September 10, 1907.

The solution of this matter depends upon the following facts which are proven on the record; that is to say: The last item of the bill, as originally ordered and contracted for by the Oliver Sollitt Company, was furnished by the Chicago Lumber & Coal Company on the 5th day of March, 1907. However, after the material was in, the inspector of the Southern Railway Company having oversight of the construction objected to sixty-five pieces "designed for us in the construction of the roof of the machine shop," because in his judgment they were defective, and thereupon the Oliver Sollitt Company notified the Chicago Lumber & Coal Company of the fact, and ordered other pieces of the same kind to take the place of the alleged defective pieces. The Chicago Lumber & Coal Company replied to the effect that the pieces it had formerly sent were such as had been ordered of it by the Oliver Sollitt Company, and therefore it would not remit any of the price charged therefor, but that it would send fifty-eight new pieces, for which it would also charge. It accordingly delivered the fifty-eight new pieces on June 14, 1907. It does not appear, however, that either the old or the new pieces—that is, those rejected and those sent in place of them—are sued for as such, but only the bill is furnished; the Chicago Lumber & Coal Company claiming that the new material, under the facts stated,

became a part of the original bill. It must therefore be assumed that both the Oliver Sollitt Company and the Chicago Lumber & Coal Company finally conceded that the pieces condemned by the inspector of the railway company were defective.

It is insisted on behalf of the Chicago Lumber & Coal Company that the fifty-eight pieces so delivered on June 14, 1907, should be treated as the last shipment under the original contract, and that the ninety days allowed by the statute for fixing the lien by notice would begin to run from that date for the whole bill. The objecting creditors deny this, and insist that the fifty-eight pieces must be treated as having been delivered under a new and distinct contract, and that such was the fact; that the last delivery made under the original contract between the Oliver Sollitt Company and the Chicago Lumber & Coal Company was made on the 5th day of March, 1907. The chancellor decreed in accordance with the contention of the Chicago Lumber & Coal Company, and the objecting creditors appealed to this court and assigned errors on the decree.

We are of the opinion that the chancellor was in error. When the last item of the original bill was delivered upon the ground by the Chicago Lumber & Coal Company, its right to fix its lien for the bill began, whether it was ever used or not. *Powder Co.* v. *Knoxville, L. & J. R. Co.*, 113 Tenn., 392, 83 S. W., 354, 67 L. R. A., 487, 106 Am. St. Rep., 836. Of course if unsuitable material is used by the contractor an abatement must be made upon the bill, on final settlement,

Voightman v. Railroad.

if demanded by the owner, to the extent that such im-
proper material impairs the work, or reduces it below
the contract price, or below the price agreed to be paid
for the defective lumber as good lumber.   Under the
statute the contractor, by ordering for the contemplated
building appropriate material from a furnisher thereof,
upon delivery of such material, places the owner of the
property and the furnished in such relation that the
latter acquires by statute the right to fix a lien there-
for upon the property by complying with the neces-
sary statutory requirements.   The relation between the
contractor and the owner in respect of this matter is in
some sense that of principal and agent; that is to say,
the contractor, as agent of the principal, has the power
to bring the owner and the furnisher in the contractual
relation above indicated, as if the owner should say to
the furnisher, "If you furnish such and such material
to the contractor for the improvement of my property,
you shall have a lien thereon for your reimbursement,
in case the contractor fails to pay you for it."   Still the
matter of personal liability rests between the contractor
and the furnisher, and the controversy must be deter-
mined from that standpoint.   Now, when the contractor
has ordered a bill of material from the furnisher, and
the bill is delivered, and the materials received, the
contract is filled.   If any of the materials are found de-
fective or unsuitable after delivery, the contractor may
refuse to pay for them, because of want of considera-
tion, or institute his cross action for breach of war-
ranty of fitness in the articles as articles so furnished

for a specific purpose, or return the articles and claim a rescission for fraud. If the defense of want of consideration should prevail, the contract price would to that extent be abated. If the cross action should prevail, compensation would be rendered for the defect. If the third defensive proceeding should prevail, the contract would be *pro tanto* set aside. If without suit the furnisher should concede the equity of the contractor's contention, and make him whole by waiving payment of any part of the bill that would amount to a settlement of that part, and no further question could arise in respect of it. So, if he should agree to a rescission, and take the goods back, this would be equally an end of the matter. If, conceding the justice of the contractor's demands, the furnisher should agree that it was his duty to make good the defect in his attempted compliance with the contract, by furnishing other material to take the place of that considered defective, so making up the difference between the goods as ordered and the goods as delivered, and should act accordingly, this act could not be construed as a part of the contract as originally made, but could be regarded only as of its true nature; that is, as reparation made for an injury inflicted. The contract as originally made and executed would stand for itself as complete in itself, whether of a perfect or of a defective kind. In such a case, the furnisher could not rightly claim that the new goods delivered constituted a part of the original contract; nor could he claim a lien therefor as against the owner, except from the date of the delivery, as un-

Voightman v. Railroad.

der a new contract, which, in fact, it is. Such delivery of new material would not lengthen the time for filing notice of the intention to claim a lien for that delivered under the original contract.

The case is different where by oversight the furnisher has omitted to ship a part of the bill contracted for; also where under the contract the goods are to be shipped from time to time as needed or ordered out. In both of these cases the goods subsequently arriving are in fact a part of the original contract. In the class of cases included in this paragraph, the time fixed by the statute with which to acquire the lien would begin to run with the date of the last item delivered.

The authorities sustain the conclusion we have reached.

In Rochell on Mechanics' Liens, it is said:

"If the contract provides for the exchange of material, and no one is misled, the lien will be in time, if within the time limit from the delivery of the articles, in exchange; but, if the material is exchanged to supply the place of defective or broken material before furnished, this does not change the time of filing to the date of delivery of the exchanged article." Section 94, p. 242, citing *R. J. Schwab & Sons Co.* v. *Frieze*, 107 Mo. App., 553, 81 S. W., 1174, and *Brown & Haywood Co.* v. *Trane*, 98 Wis., 1, 73 N. W., 561. The cases cited sustain the text.

It is insisted for the Chicago Lumber & Coal Company that they do not.

The facts in *Schwab & Sons Co.* v. *Frieze*, supra, were substantially as follows: Frieze had entered into a contract with one Eshelman, by which he was to put a furnace in each of two houses owned by Eshelman. To enable him to carry out this contract, Frieze, on August 22, 1902, mailed an order to R. J. Schwab & Sons Company, a manufacturer at Milwaukee, Wis., to ship to him two "No. 44 Gilt Edge Furnaces," with casings. Schwab & Sons Company, on September 11, 1902, shipped by railway the two furnaces ordered, which a few days thereafter were received by Frieze, with an invoice of the goods. However, in the transportation of the furnaces a lower ash pit door frame to one of them was broken; and, on November 5th next following, Frieze telegraphed to Schwab & Sons Company to ship to him by express "one lower ash pit door frame," which request was promptly complied with, but no charge was made for the new part so furnished, and it did not appear that Frieze paid anything for it. On the day the new part was shipped, November 6, 1902, an entry was made on the books of Schwab & Sons Company charging $2.16 for it, and at the same time Frieze's account was credited with the same amount because of the breaking of the lower front originally shipped. The court said it was thus obvious that the new item of $2.16 had nothing to do with the indebtedness of $162 for the furnaces, which had accrued on September 11th, and which was the only indebtedness for which the lien was claimed; that there was no other item on the account for which a charge was made, and

for which a lien was claimed; that the two debit and credit items of $2.16 did not affect the item of $162 for which the lien was claimed, to which they had no relation; that the right of the plaintiff, Schwab & Sons Company, to a lien for the $162 indebtedness was to be determined without reference to the $2.16 item of the account; and that, since that lien was not filed within the four months after the $162 indebtedness accrued, as required by statute, it was ineffectual.

We think this is a clear holding to the effect that, where a new part is furnished to take the place of a defective part, the time for filing the lien for the original bill will not be extended thereby, so as to date the beginning of the time for acquiring the lien to the time of furnishing the new or substituted article.

In *Brown & Haywood Co.* v. *Trane*, 98 Wis., 1, 73 N. W., 561, the facts were these: The plaintiff, as sub-contractor, furnished glass for a building to the principal contractor, who used it in the building but, discovering that a portion of it was defective, notified the plaintiff of the fact. He thereupon shipped new glass to replace that which was defective. This new glass was received at the railroad depot agreed upon as the place for delivery, but was left there and never used in the building. The plaintiff gave to the owner of the building written notice of his claim for a lien within sixty days after the second shipment, but not until more than sixty days after the first glass as used in the building and not until after the owner had settled with and paid the principal contractor. In disposing of this mat-

ter the court said that it was clear that the glass was defective, and not in compliance with the contract; that this was conceded by the plaintiff's shipment to the contractor of two new plates to supply the place of those which were defective; that these plates were never delivered to, or accepted by, the owner, and they were never wrought or put into the building. It was further said that the contention that plaintiff's delivery of the two substituted plates for the defective ones previously shipped to the contractor, and which arrived there December 18, 1895, made that the last date upon which the plaintiff furnished the materials were wholly untenable; that work done or materials furnished within six months prior to the filing of a mechanic's lien, to compensate for defective performance of a building contract completed more than six months prior thereto, would not extend the time and preserve the right to file such lien—citing *Harrison* v. *Homepathic Ass'n*, 134 Pa., 558, 19 Atl., 804, 19 Am. St. Rep., 714.

The case of *Kennebec Framing Co.* v. *Pickering*, 142 Mass., 80, 7 N. E., 30, was also referred to, to the effect that where a person furinshed lumber at a certain price per 1,000 feet, at different times, under an entire contract, in the erection of a building, he lost his lien if he neglected to file his statement of the amount due him within thirty days after the last item was furnished by him which was actually used in the erection of the building.

Applying this last case, it was said that the last glass actually used in the building which the court had under

consideration was furnished more than sixty days before the plaintiff gave notice of its claim of lien.

This case is somewhat impaired as an authority in this State by reason of what is said by the court upon the subject of not using the materials, since the rule in this State is that, other things being equal, the delivery of the material upon the ground for use is sufficient. However, the case is an authority for the proposition that the furnishing of other material to take the place of defective material will not extend the time for filing a lien for the original bill.

The subject is pretty fully illustrated in the case of *Harrison* v. *Homepathic Ass'n.* supra. In the opinion of the court referring to a previous report of the case in 120 Pa., 28, 13 Atl., 501, the court said it had been decided that the furnishing and setting of two soapstone hearths, on the 9th of March, 1887, to compensate the deficiency in work done and charged for on the 7th of July, 1886, did not extend the time for filing the lien. It was further said that the evidence produced by the appellants on the trial brought their case fairly within the principles of the decision referred to, and demonstrated that their claim was not filed in time. They proved, it was said, that the two soapstone hearths put in by them on the 9th of March were to supply the two broken soapstone hearths included in their charge on the 7th of July preceeding; that they were required by the architect to replace the broken hearths by sound ones, and that they did so without protest or additional compensation; that these hearths were broken when first seen and in-

spected by the architect, and that whether their condi-
tion was caused by the defective materials or defective
setting was unimportant. The court referred to the
case of *McKelvey* v. *Jarvis*, 87 Pa., 414, to the effect
that work done to compensate defective performance
of a contract for work and material in the construction
of a building will not preserve the lien, but that work
substituted for that called for in the contract might do
so. It was held that in the former instance the contract
was unchanged, the work done without charge to the
owner or contractor, and to make good the previous de-
fault of the mechanic of materialman, while in the lat-
ter the work was done under a contract modified by an
agreement of all the parties interested in it, which dis-
tinction was noted and illustrated in the case of 120
Pa., 28, 13 Atl., 501. The court distinguished the rule
laid down in *McKelvey* v. *Jarvis*, supra, from that laid
down on the claim of Brenneman & Ward, in *Parish's
Appeal*, 83 Pa., 111. It was said that in the latter
case the work done by the claimants was in exact compli-
ance with their contract with the owner, and the alter-
ation of the appliances therein referred to was made
necessary by a mistake in the drawing furnished by the
latter; that it was not done to compensate a deficiency
in the work of the claimants, but was required by the
owners to correct their own error at their own expense.
The court held that the appellants were not entitled to a
lien for the soapstone hearths put in on the 9th of March
1887, to supply the deficiency in those put in on the 7th
of July, 1886; that the last work done and materials

furnished by them for which they could have a lien was on the 30th of October, 1886, and, since they did not file their claim until the 25th of June, 1887, it was not filed in time, and they were not entitled to recover.

The principles stated in *Harrison* v. *Homeopathic Ass'n*, and in the other cases referred to, are in harmony with the illustrations appearing in the opinion of this court in 113 Tenn., 403, 404, 83 S. W., 354, 67 L. R. A., 487, 106 Am. St. Rep., 836, drawn from Phillips on Mechanics' Liens, p. 530. The first case put is where a party furnished materials for a building at different times, but in pursuance of one contract. It was said that he would be in time if he began proceedings to establish his lien within the period allowed by statute, counting from the date of the last act done in execution of the contract as where persons made a contract, in May, 1857, with machinists for all machinery and materials required to build a mill, and received them all at that time, excepting the bolting cloth; it being uncertain what kind of cloth would be needed. They informed the machinists that they would order it from them afterwards, which was done, and it was received in the following September. The machinists commenced proceedings to enforce the lien within the statutory period, counting from the last item, but not if from the former. It was held that, as the cloth had been furnished under the same contract as the other materials, the proceedings were commenced in time to enforce the lien for the whole amount of materials furnished. So where, in the fall of 1867, the plaintiffs contracted with an owner

to furnish him lumber for the erection of a new dwelling house and the repair of an old one, and they commenced furnishing lumber for that purpose the same season, and continued to do so until the last day of August, 1868, and in August 1868, the person who made the contract with the plaintiffs became owner of a second lot immediately adjoining the first mentioned, and removed the old house upon it and made the repairs on that house in the spring of 1869, and in that spring also the contract for lumber was enlarged by the plaintiffs agreeing to furnish lumber to build a barn, it was held that for the purpose of enforcing a lien against the owner it was but a single contract for the whole lumber, and that the time in which it could be enforced was to be counted from the last delivery.

This last case falls within the principle of *McKelvey* v. *Jarvis,* supra, and within the distinction noted and illustrated by Clarke, J., in *Homeopathic Ass'n* v. *Harrison,* 120 Pa., 28, 13 Atl., 501. In accord, also, are the cases of *Albright* v. *Smith,* 2 S. D., 577, 51 N. W., 590; *State Sash & Door Mfg. Co.* v. *Norweigan Seminary,* 45 Minn., 254, 47 N. W., 796; *St. Paul Press Brick Co.* v.*Stout,* 45 Minn., 327, 47 N. W., 974; *Chapman* v. *Wadleigh,* 33 Wis., 267—all cited in the brief filed for the Chicago Lumber & Coal Company. *Bernsdorf* v. *Hardway,* 7 Ohio Cir. Ct. R., 378, and *Yearsley* v. *Flanigan,* 22 Pa., 489, present merely the ordinary cases where the time is held to be run from the date of the last item furnished under the contract. The case of

*Washington Bridge Co.* v. *Land & River Improvement. Co.,* 12 Wash., 272, 40 Pac., 982, merely presents a case where the parties, in effect, agreed to a performance of a certain part of the work, retaining a part of the price to secure the completion of the whole; upon the completion of which reserved work it was held by the court that the time began to run for the whole contract. The two cases of *Bruce* v. *Berg,* 8 Mo. App., 204, and *Burns* v. *Braun,* 35 Mo. App., 337, we have not had access to. We are of the opinion, however, in what has already been said we have correctly stated the true legal result.

It is insisted for the claimant that it is entitled to enforce its lien under the general mechanic's lien law (Shannon's Code, section 3531 *et seq.*), and that inasmuch as its bill was filed immediately upon the completion of the building, and contained a sufficient statement of the claim, its right was perfected under the sections of the Code last referred to. In behalf of the objecting creditors it is insisted that these sections of the Code do not apply to a claim for work done or materials furnished for the construction of a building upon the line of a railway company for use in its business, but only section 3570 *et seq.* of Shannon's Code, embracing the provisions of chapter 220 of the Acts of 1883, and chapter 98 of the Acts of 1891. We are of the opinion that the latter view is the correct one. It was not intended by the legislature that a person who had constructed a depot, for instance, for the use of a railway company, or who aided in the construction of a

bridge upon its line, should have the right to enforce its lien by sale of such structure separated from the railway line considered as a whole. To permit a lien to be enforced upon such separate structure would be in effect to enable the lien claimant to stop the operations of the road, especially in the case of the sale of a bridge. It is obvious from this consideration that it could not have been intended that a single structure should be sold. In accordance with this view, it is perceived that the statute, which gives the lien for work done upon the roadbed of a railway company, or any of its structures, provides for a lien upon the whole line of railway within the State. Upon the enforcement of such a lien of course the purchaser of the line takes the place of the former company and discharges the public duties imposed upon it.

It is next insisted by the claimant that the objecting creditors do not stand in such a position that they can make the questions above made against the claim presented. We think this is a mistaken view, since the claimant is seeking to participate as a lienor in the fund to which the objecting creditors are likewise looking for payment of their claims. They have the right to protect this fund against a lien claimed against it.

It is unnecessary to consider the other points presented. On the grounds stated, we are of the opinion that the chancellor erred in allowing the second claim of the Chicago Lumber & Coal Company as a lien upon the fund paid in by the Southern Railway Company in the satisfaction of the lien upon its line of railway.

Voightman v. Railroad.

A decree will be entered in accordance with the fore-going opinion, and the cause will be remanded for fur-ther proceedings.  The Chicago Lumber & Coal Com-pany will be taxed with the costs of the appeal.