MOUNTAIN CITY MILL COMPANY v. E. A. LINDSEY et al.

Middle Section. June 15, 1928.

Petitions for Certiorari denied by Supreme Court, December 8, 1928.

338

Roberts & Roberts, of Nashville, for appellants.

Miller, Miller & Martin, of Chattanooga, and Joseph C. Higgins, of Nashville, for appellee.

FAW, P. J. This is a suit on a contract of guaranty. A judgment was rendered by the chancery court in favor of the complainant Mountain City Mill Company and against defendants E. A. Lindsey, S. B. Reid, L. D. Scott, P. J. Stumb and G. A. Maxwell for the principal sum of $5,481.64, and $849.65 interest thereon from the date of the filing of the bill (September 5, 1924) to the date of the decree (August 5, 1927), making the full sum of $6,331.29, and also for the cost of the cause, for all of which execution was awarded.

The defendants against whom judgment was thus rendered have brought the case to this court by an appeal, duly perfected, and have assigned errors upon the findings, opinion and decree of the chancery court.

Along with the appellants, Mrs. Frankie B. Villines was a party-defendant to the complainant's bill when filed, but while the suit was pending in the chancery court the complainant was permitted, without objection, to dismiss its bill against her, which dismissal was "without prejudice."

The facts found by the learned Chancellor, and his views of the law applicable to the facts, appear from his "findings of fact and opinion" made a part of the record, as follows:

"This is a suit brought by Mountain City Mill Company against E. A. Lindsey, Frankie B. Villines, S. B. Reid, L. D. Scott, P. J. Stumb and G. A. Maxwell on a contract of guaranty.

"The bill states in substance as follows:

" 'Complainant is a manufacturer and seller of flour, meal and bakery products.

" 'Defendants are stockholders in Parham-Lindsey Grocery Company, a corporation formerly engaged in operating a number of retail grocery stores in Chattanooga and other places.

" 'For some time prior to the execution of the guaranty in question, complainant had been extending credit to Parham-Lindsey Grocery Company. The account had grown larger than complainant felt it could safely carry and complainant refused to continue to carry it at such a high figure. Thereupon to induce complainant to continue to advance credit and carry the account at a higher figure, defendants, as stockholders in the Parham-Lindsey Grocery Company, gave the guaranty now in question.'

"The guaranty reads as follows:

" 'Nashville, March 7, 1922.

" 'Mountain City Mill Company,

" 'Chattanooga, Tennessee.

" 'Gentlemen:

" 'Referring to your letter of March 3rd, addressed to the Parham-Lindsey Grocery Company, we, the undersigned stockholders in the Parham-Lindsey Grocery Company hereby undertake to indemnify you against loss in selling the Parham-Lindsey Grocery Company to the extent of $10,000, provided that this $10,000 so guaranteed is over and above a line of credit of $10,000 which you agree to give the Parham-Lindsey Grocery Company without any guaranty. In other words, it is intended by this writing that the Parham-Lindsey Grocery Company shall have a credit to the extent of $20,000 or so much thereof as may be necessary. Of this, $10,000 is to be carried by you on a straight line of credit of the Parham-Lindsey Grocery Company, and any additional amounts over and above the $10,000 straight line of credit is to be guaranteed by the undersigned to the extent of $10,000 over and above the $10,000 straight line and no more.

" 'It is understood that hereafter at any time when it suits this concern to make you a statement, if the statement referred to satisfies your credit department, this guaranty will be surrendered back into our hands.'

"This guaranty was signed by all of the defendants. Relying on the above guaranty, complainant sold a large bill of goods on credit to the Parham-Lindsey Grocery Company.

"In March, 1923, Parham-Lindsey Grocery Company became involved in financial difficulties. Its assets, or a major portion of them, were converted into cash by a creditors' committee and distributed, pro rata, among its various creditors, including complainant. When the creditors' committee took charge, Parham-Lindsey Grocery Company owed complainant on the account $22,502.17. The payments or dividends received by complainant from the creditors' committee amounted to $14,518.36. Complainant applied $10,000 of this amount to the $10,000 unsecured straight line of credit, $2502.17 to the excess over the guaranteed line of credit, and the residue on the guaranteed line of credit, thus leaving $7983.81 unpaid on said guaranteed line of credit. Complainant asks for a decree against the defendants for this amount and for the costs of the court.

"All of the defendants filed answers to the bill.

"The suit was dismissed as to defendant Frankie B. Villines, and her answer will not be adverted to. No exception was made to said dismissal.

"The answer of the other defendants is a joint answer, and in substance, is as follows:

"Defendants admit that prior to March, 1922, complainant extended credit to said Parham-Lindsey Grocery Company, but deny that complainant declined to extend credit for an amount in excess of $10,000. On the contrary, complainant extended credit to said company to an amount in excess of $20,000, and early in March, 1922, said company was indebted to complainant in an amount in excess of $20,000.

"Defendants admit that they wrote the letter set out in the bill, but deny that it is susceptible of the construction placed thereon by complainant. They deny that the contract made in said letter was for the purpose of inducing complainant to extend credit to said grocery company. They deny that said letter was ever accepted by complainant or that they were notified of such acceptance. They say that said letter was nothing more than a proposition of guaranty; that said proposition never became binding upon them, and that they never became

guarantors of the account of said grocery company then or thereafter owing to complainant.

"They admit that said grocery company became involved in financial difficulties and that it has ceased to be a going concern. They admit that its assets, or the major portion thereof, had been converted into cash and have been distributed, pro rata, among the various creditors of said grocery company, including complainant. They admit that payments or dividends received by complainant from the committee amounted to $14,518.36. They deny that complainant had the right to apply said amount as it has done.

"Defendants contend that there was no consideration for the execution of said paper writing of March 7, 1922.

"Defendants say that the creditors' committee was appointed at the instance of complainant and other creditors of said grocery company and that the entire assets of said company were exhausted by the complainant and other creditors, and that said assets were applied, pro rata, among all the creditors of said grocery company toward the discharge of its debts and obligations to them. Said payments were not voluntary and complainant had no right to apply the assets so distributed by said creditors' committee upon the unsecured portion of its debt.

That "complainant extended credit to said Grocery Company to the extent of over $22,000 and this operated in law to release and discharge defendants from the obligation to complainant on account of said letter of March 7, 1922, because said credit was in excess of the straight line of credit of $10,000 plus the $10,000 which complainant claims was guaranteed by the letter of March 7, 1922.

"Defendants say that even if said letter of March 7, 1922, had been duly accepted and notice thereof given to all the subscribers thereto, it then became the legal duty of complainant to give notice to the signers of said letter of any defaults in payment by said grocery company of the account due complainant within the line of credit of $10,000 in excess of the straight line of credit of $10,000 and thus give them an opportunity to protect themselves in the premises as they could and might have done, and that the failure of complainant to give such notice operated to the injury and prejudice of the rights of defendants and relieved and discharged them from any and all obligations under said letter.

"Defendants deny that complainant had the right to apply all payments made by it on the unsecured portion of said ac-

count until they were extinguished before making any application of payments or credits on the secured portion thereof.

"Later on an amended answer was filed, in which defendants state that the appointment of the creditors' committee was made without any notice to them, that they were not present thereat, did not participate therein, and are not bound thereby. That the agreement and arrangement made at said creditors' meeting was an entirely new contract and relieved them from further liability on said letter of March 7, 1922.

"Briefly stated, the main facts in the case are these:

"The Parham-Lindsey Grocery Company was a corporation doing business in Chattanooga. Mr. T. G. (or Grady) Parham was its president, lived in Chattanooga, had direct management of its business, and was in personal charge of its affairs. Mr. E. A. Lindsey was its trasurer, lived in Nashville and looked after its finances. It was customary with Mr. Parham to take things up with Mr. Lindsey. Mr. S. H. Campbell was secretary and treasurer of the complainant, lived in Chattanooga and attended to the finances of the complainant. The Parham-Lindsey Grocery Company was a customer of the complainant and the business transactions between the two companies were conducted between Mr. S. H. Campbell on the one side and Mr. Parham and Mr. Lindsey on the other.

"The guaranty sued on was given under the following circumstances:

"Mr. Campbell sent for Mr. Parham and told him that complainant could not continue to extend to the Grocery Company the credit that had been lately extended to it, and that the indebtedness of the Grocery Company to complainant must be cut down to the neighborhood of $10,000 and in confirmation of this conversation and in behalf of complainant, he wrote Mr. Parham, as representing said Grocery Company, the following letter:

" 'Chattanooga, Tennessee,
" 'March 4, 1922.

" 'Mr. Grady Parham, Manager,
" 'Parham-Lindsey Company,
" 'City.

" 'Dear Sir:

" 'Referring to our recent conversation relative to your account with us, of course, you appreciate the fact, Mr. Parham, that we are delighted to have your business and think you will bear me out in the statement, we have shown our appreciation in every way we consistently could, but we shall be

obliged to have some better understanding in the matter as to extent to which we can carry the account.

" 'As I explained to you, we are heavy borrowers ourselves, and even though we do presumably a cash business, returns on order notify shipments don't reach us frequently for a week or ten days, and in consequence we have a good deal of money outstanding all the time.

" 'Your account this afternoon shows on the mill books a debit balance of $20,534.59, and on the bakery books $1787.22, aggregating a total of $22,322.81.

" 'Your business with us is approximately eight to nine thousand dollars a month, so you will see we are giving you an average of practically two and one-half months. We are sorry to tell you the margins will simply not permit our doing this. ¡An average of thirty days is as much as we can do, and we are going to ask you to refer this communication to your associates at Nashville and insist upon their putting in some additional capital, if necessary, so you can reduce this account to approximately $10,000.

" 'Trusting you appreciate our position in the matter and again thanking you for your generous consideration, beg to remain,

" 'Yours very truly,

" 'Mountain City Mill Company,

" 'By S. H. Campbell, Sec. and Treas.'

"Upon the receipt of this letter, Mr. Parham had a conversation with Mr. Lindsey in consequence of which Mr. Lindsey sent said guaranty to Mr. Parham, who delivered it to Mr. Campbell. In addition to this, Mr. Campbell had a conversation with Mr. Lindsey which he details in his deposition as follows:

" 'Q. Now did I understand you to say a minute ago that this contract of guaranty of March 7, 1922, was sent in reply to requests or demands on the part of the Mountain City Mill Company? A. It was.

" 'Q. Were any of those requests or demands made orally instead of by mail? A. Not to any of those who signed that.

" 'Q. Did you have any oral conversations with Mr. Lindsey? A. I had conversations with Mr. Lindsey but I don't remember whether prior to the signing of this contract or afterwards.

" 'Q. Please repeat as near as you can those conversations. A. Being in Nashville on other business, I went around to see Mr. Lindsey late in the afternoon, after banking hours, and

had quite a conversation with him regarding the business over here. I was really working in Mr. Parham's interest trying to get him to put more capital in. In my conversation with Mr. Parham I thought that was what was needed, and it impressed me that Mr. Parham was doing everything he could, but needed more money. Mr. Lindsey assured me the company, while it had not paid in probably enough capital to run the business as it should have been, they had ample means back of them, and he told me he had in a private box in the vault collateral sufficient to guarantee the subscribed stock and it was optional just when he called in more money and charged it to these different accounts. That he had the power to do it, that he refused to undertake to finance the company until they had signed over to him this collateral, and he had enough to make it safe and at the proper time he would put more money in the business. In the course of the conversation he gave me every assurance that the company was perfectly responsible.

" 'Q. State briefly why this guaranty was given and why the Mountain City Mill Company requested it. A. We were just carrying the account for too large an amount. We could not afford to. We could not hazard our interest by extending the line of credit they were calling for.'

"On the receipt of the letter of March 7, 1922, which is the guaranty in question, complainant allowed the Parham-Lindsey Grocery Company the credit it wanted, and in doing so relied on said guaranty. No notice of a withdrawal of said guaranty was ever given it by any of the parties signing the same.

"The Parham-Lindsey Grocery Company became involved financially, and it was thought best for the interest of all parties that it should be placed in the hands of a creditors' committee. This action was a voluntary one on the part of the Grocery Company. The creditors' committee consisted of three people, of whom Mr. Parham was one. The signers of the guaranty knew of the situation of the company and of its being placed in the hands of this committee. Mr. Campbell, representing the complainant, was present at the meeting, but was not responsible for the calling together of the creditors. A minute of the meeting of the creditors is as follows:

" 'At a meeting of a majority of the creditors of the Parham-Lindsey Grocery Company, held in the offices of the Chattanooga Association credit men, Chattanooga, Tennessee, at one o'clock p. m., March 7, 1923, there being over $100,000 of the indebtedness of the Parham-Lindsey Company represented,

it was stated by Mr. T. G. Parham that he and E. A. Lindsey, Secretary, had blanket authority in a resolution passed by the Board of Directors of the Parham-Lindsey Grocery Company to make sale of the assets of the concern, and to liquidate their business to his best ability and as his best judgment directed.

"'In order to satisfy all creditors, as to proper distribution of funds, and also receipt of funds, after discussion, the following resolution was passed, the resolution being offered by Mr. Henry King of Trigg, Dobbs & Company, seconded by Mr. S. H. Campbell of the Mountain City Mill Company, the resolution unanimously passing, Mr. T. G. Parham also agreeing to the resolution:

"'That the creditors' committee appoint a committee of two to act as trustee, together with Mr. Parham, to receive all funds and to place them in the bank in the name of the committee. Therefore each creditor receives pro rata of such funds. This committee to be advisory and also empowered to hold all expenses of the liquidation to a minimum, to protect all in the proper amounts received from H. G. Hill Company, purchaser, also from all accounts receivable, and to have full access to all records. The committee's activities to cease when all creditors are paid in full, or at such time as all available funds are in hand and distributed pro rata, provided funds received do not pay creditors in full.

"'All of the above agreeable to us and we here with affix our signatures this the 7th day of March, 1923.'

"This resolution is signed by a number of creditors and also the following is written under the same:

"'The above is accepted and we agree to abide by the will of said Advisory Committee in all respects.

"'T. G. Parham, President.

"'E. A. Lindsey, Sec. by T. G. Parham.'

"At the time of the appointment of said creditors' committee, the Parham-Lindsey Grocery Company owed complainant $22,502.17, and the creditors' committee, out of the assets collected from the winding up of said Grocery Company, paid complainant $14,518.36.

"On July 6, 1923, complainant wrote Mr. E. A. Lindsey as follows:

"'Referring to the Parham-Lindsey account and the guaranty you and your associates executed in our favor, under date of March 7, 1922, we have not told any of the other creditors of our having this document, as we did not know what

effect it might have on the final settlement, but since it begins to look as if we have probably gotten all we are going to get out of the estate we thought it well enough to bring the matter to your attention and explain to you that in the final analysis we shall expect to hold the signers of the guaranty responsible in accordance with the agreement. . . .

" 'Our claim was filed with the creditors' committee for a total of $22,502.17, this representing the mill and bakery accounts, which is always understood to be carried as one. Against this we have received in dividends $14,518.36, leaving a balance of $8,004.81, and our interpretation of this guarantee was that we were indemnified against any loss in the extension of credit exceeding $10,000 and up to $20,000, and on the strength of this we felt no hesitancy in supplying the company's requirements, even to the extent of going a little beyond the credit line, feeling that under no circumstances should we lose more than our pro rata of the first $10,000 and of any amount in excess of $20,000. So on this basis we respectfully call upon you to remit $8,004.81. . . .

" 'We regret exceedingly that the company was not successful but have never understood why.

" 'Your prompt attention will be appreciated.'

"This letter not being answered, complainant, on September 28, 1923, wrote the following:

" 'E. A. Lindsey,

" '% Tennessee Hermitage National Bank,

" 'Nashville, Tennessee.

" 'Dear Sir:

" 'We did not get a reply from you to our former communication concerning the affairs of the Parham-Lindsey Company. . . . We therefore call upon you and your associates to make good the guaranty executed under date of March 7, 1922, on the Parham-Lindsey account.

" 'We have received in dividends and applied as credit memorandums a total of $14,518.36 credit on the account. Of this we applied $12,502.17 to the payment of the portion of the account not covered by your guaranty, and $2,016.19 applied to those portions of the account covered by your guaranty. This leaves a balance of $7,983.81 which you and your associate guarantors will owe us, and we shall appreciate your prompt remittance.

" 'In the carbon copy of our letter of July 6th, we note a clerical error in that we stated the balance due from you to be $8,004.81, instead of $7,983.81, which is the correct amount.

" 'We have not the addresses of the other guarantors, so we are unable to address a letter to them, and in so much as our correspondence has been with you in their behalf, we respectfully ask that you take the matter up with them in due course.

" 'Awaiting your early advice and trusting this can be adjusted without the necessity of any unpleasantness or legal interference, we beg to remain,

" 'Yours truly,

" 'Mountain City Mill Company.'

"No action being taken under either of said letters, complainant brought this suit.

"The principal questions to be decided in this lawsuit are:

"1. The complainant contends that the only question to be decided is how the $14,518.36 paid by the creditors' com-, mittee is to be applied on the indebtedness of the Parham- Grocery Company of $22,502.17.

"The defendants contend that they are not liable on their guaranty for the following reasons:

"1. That the paper signed by them was a proposition of guaranty which was never accepted by the complainant.

"2. That the creditors' committee was appointed at the instance of complainant and other creditors, and that it was an involuntary proceeding on the part of the Grocery Company.

"3. That the extension of credit by complainant to the Grocery Company of over $22,000 operated to release them from said guaranty.

"4. That it was the legal duty of complainant to notify them of the various matters which took place, so that they might protect themselves.

"5. That they had no notice of the appointment of the creditors' committee.

"The defendants also say that the complainant had no right to apply the payments made by it by the creditors' committee as it has done on the indebtedness due it by the Grocery Company.

"Very able and exhaustive briefs have been prepared by the lawyers representing the various parties and their contentions will now be taken up.

"The complainant in the brief submitted in its behalf has cited a great many authorities in support of the application of the payments received by it from the creditors' committee on the indebtedness due it by the Grocery Company and the

defendants have also furnished a great many authorities against this manner of application by the complainant. It seems to the court, however, that it will be unnecessary to go into all of these authorities because there was a contract between the complainant and the defendant as to how the payments were to be made, and in addition to that, the parties on both sides have given their construction of this contract, and this construction by each one agrees with that given the instrument by the other.

"Mr. Lindsey, who drew the contract of guaranty, in his deposition says as follows:

" 'Q. You did not understand my question. Did you have any agreement then with the Mountain City Mill Company as to how the payments made by your company, mainly, should be applied on your account? A. Well, I say yes, we did. And I say this very contract here is the very thing that does that very thing, because whenever the payments were made necessarily under this agreement here, they were compelled to be applied first to the part of the debt which was unsecured, because otherwise there would be no value in this contract. That had to be applied there first and thereafter applied to this part that we were security on.'

"The complainant in its letter of July 6, 1923, to Mr. Lindsey, also gives its construction of the contract and Mr. Campbell also testifies as follows:

" 'On the strength of the guaranty for the second $10,000 the guaranty provided that we were protected on between $10,000 and $20,000; if we went over $20,000, we did it at our own risk.'

"It is therefore the opinion of the Court that if defendants are liable to complainant, the amount of their liability is to be estimated as follows:

"The total indebtedness is $22,502.17. This is composed of $10,000 unsecured indebtedness, $10,000 of secured indebtedness and $2,502.17 of unsecured indebtedness. The amount paid on these various items was $14,518.36. The proper method of applying this credit on the indebtedness is to take $10,000 of it and apply it in payment of the first $10,000 or the unsecured $10,000. This leaves $4,518.36 to be applied on the $10,000 of secured indebtedness, which, being deducted from said $10,000 leaves $5,481.64. There is nothing to be applied on the $2,502.17 and complainant loses this.

"The next question to be decided is as to whether defendants are liable for any part of this $5,481.64.

"It is shown by the proof that the guaranty was delivered to complainant by the president of the Parham-Lindsey Grocery Company, and that it was never returned, and that none of the guarantors ever withdrew therefrom, and that the complainant went ahead and made advances and extended credit to the Grocery Company upon the faith of the guaranty. This is clearly an acceptance by the complainant of this guaranty.

"It is also shown that while Mr. Campbell was present at the creditors' meeting, he had nothing to do with its calling, and was only present thereat; and it is also shown that it was a voluntary matter on the part of all the parties concerned, and that the matter was arranged in this way so that the expenses of winding up the business of the Grocery Company should be as light as possible; and it is also shown that this agreement included only the Grocery Company and did not include the guarantors. In my opinion this does not release defendants on their guaranty. Myers v. International Trust Company, 273 U. S. 380, 71 L. Ed. 692.

"Nor are the defendants correct in saying that an extension of credit by the complainant to the Grocery Company of over $20,000 released them from their guaranty. This has been decided to the contrary in the case of Stearns v. Jones, 138 Tenn., 589.

"Defendants are also in error in saying that it was the duty of the complainant to notify them of the various matters that took place between complainant and the Parham-Lindsey Grocery Company, and that as they were not so notified they are released.

"The case of Stearns v. Jones, supra, decides that guarantors do not occupy the same place as sureties, but even if they did, defendants would still be wrong in their contention.

"In Crawn v. Commonwealth, 84 Va., 282, the court says:

" 'It is also said that a surety is a favored debtor. His rights are especially and zealously guarded, both at law and in equity, and the slightest fraud by the creditors annuls it. His contract, exactly as he makes it, is the measure of his liability, and cannot be varied without his consent. With these privileges, however, are associated certain duties. He must take care of himself, and obtain all the information essential to his interest which lies within his reach. It is no part of the duty of the creditor to furnish him such information. If he neglects his interest and a loss occurs, he must bear it, unless he shows that it was in consequence of the creditor's fraud.'

"In Watertown Fire Insurance Company v. Simmons, 131 Mass., 85, the court says:

" 'But the creditor owes no duty of active diligence to take care of the interest of the surety. It is the business of the surety to see that his principal performs the duty which he has guaranteed, and not that of the creditor. The surety is bound to inquire for himself and cannot complain that the creditor does not notify him of the state of accounts between him and his agent for whom the surety is liable. Mere inaction of the creditor will not discharge the surety unless it amounts to fraud or concealment.'

"It is shown that the defendants had notice of the creditors' meeting, and they took no action after receiving this notice.

"It is therefore the opinion of the court that complainant recover of all the defendants, except Mrs. Villines, the sum of $5,481.64 with interest thereon from the filing of the bill, together with the costs of this suit.

"Newman,

"Chancellor."

The assignments of error, fifteen in number, are resolved by appellants' counsel, in their brief, into three general propositions.

1. The first contention of appellants is that, for the reasons stated below, the letter of March 7, 1922, set forth in the Chancellor's findings, never became binding and obligatory on the appellants, as a contract of guaranty.

(a) Appellants say that the aforesaid letter of March 7, 1922, was a mere offer to guarantee; that none of them received notice of acceptance thereof by the Mill Company, and hence they were never bound thereby.

A mere offer or proposal of guaranty does not become binding on the proposed guarantor until it is accepted by the person to whom it runs; and, as a general rule, it is essential, in order to bind the one offering the guaranty, that notice of such acceptance be seasonably given. 12 R. C. L., pp. 1067-1070; Brandt on Suretyship and Guaranty (3 Ed.), sec. 205.

"But "where the guaranty is given in response to a request for it by the creditor no notice of acceptance is necessary, for the answer of the guarantor to the request sufficiently shows that he knew he had assumed responsibility," and "it has been held that acceptance of a guaranty is not necessary to charge the guarantors where the guarantors are stockholders and directors in the corporation whose future debts are guaranteed and where the guaranty is delivered and credit thereafter extended on the strength of it." Brandt, supra, Sections 213-214, and cases cited in the notes to those sections.

However, we do not construe the instrument here in question as a mere proposal, but as an actual contract of guaranty, which required no notice of acceptance in order to render it an enforceable obligation. "The settled law in this State now is that, where the instrument purports to be an absolute engagement, no notice either of the acceptance of the guaranty or of nonpayment by the principal is necessary; that such absolute guaranty takes effect as soon as it is acted upon; and to support an action against the guarantor, nothing more is necessary to be shown than that the party to whom it is addressed acted under it." Yancey v. Brown, 3 Sneed, 89, 96; Bright v. McKnight, 1 Sneed, 158, 166.

(b) It is claimed on behalf of appellants that the guaranty was without consideration and therefore nonenforceable. We do not think so. The guarantors were stockholders in the Parham-Lindsey Grocery Company, and the complainant Mill Company extended credit to the Grocery Company on the faith of the guaranty of appellants. This extension of credit to the corporation in which appellants were stockholders (and, as such, the ultimate beneficiaries of its expected profits) was a sufficient consideration moving to the appellants to support the contract of guaranty. Doud v. National Park Bank, 54 Fed., 846; Birken v. Tapper, 45 S. D., 600, 24 A. L. R., 832, 189 N. W., 698; Bond v. Farwell Company, 172 Fed., 58, 63.

Furthermore, the Mill Company was demanding that the account and line of credit of the Grocery Company (then about $22,000) be immediately reduced to $10,000, but, upon the execution of the guaranty contract by appellants, the Mill Company withdrew its demand for the reduction of the account and continued to extend to the Grocery Company a line of credit of $20,000 and more. This forbearance was, in law, a consideration for the guaranty. Brandt, supra, sec. 25; Townsend v. Neuhardt, 139 Tenn., 695, 698, 203 S. W., 255.

It also appears that, after the guaranty in question was executed, the Mill Company sold to the Grocery Company merchandise on credit to the amount of about $100,000, and approximately one-half of this credit was extended in reliance on the guaranty of the appellants. This is true for the reason that the account of the Mill Company against the Grocery Company was, at all times after the guaranty was given and before the liquidation of the Grocery Company, somewhere in the neighborhood of $20,000. The account fluctuated by reason of a succession of charges for merchandise and credits for payments made by the Grocery Company, and was sometimes a few thousand more and sometimes a few thousand less than $20,000. Such extension of credit to the Grocery Company was a sufficient consideration to support the contract of guaranty. 12 R. C. L., pp. 1076-1078, sections 28-29.

2. It is insisted for appellants that, if the letter of March 7, 1922, was accepted by the Mill Company and became binding on appellants as a guaranty contract, nevertheless appellants were subsequently released and discharged from liability thereon by certain acts and conduct of the complainant Mill Company.

(a) Appellants say that the act of the Mill Company in extending credit to the Grocery Company to the extent of $22,502.17 operated in law to release and discharge appellants from the obligation of the guaranty, because such credit was in excess of the straight line of credit of $10,000 plus the $10,000 guaranteed by appellants.

We do not construe the guaranty contract of March 7, 1922, as limiting the maximum amount of credit which the Mill Company might extend to the Grocery Company. The contract evidenced by the letter of March 7, 1922, was a "continuing guaranty." Stearns v. Jones, 138 Tenn., 589, 199 S. W., 400.

The guarantors were stockholders in the Grocery Company and it will not be presumed that they desired to deprive the Grocery Company of necessary credit. The guarantors were not injured by the Mill Company's extension of credit to the Grocery Company in excess of the sum guaranteed. It is a reasonable assumption that if the Mill Company had restricted the Grocery Company's account to $20,000, the Grocery Company would have bought elsewhere such merchandise as it needed.

"Where a guaranty limits the amount for which the guarantor shall be liable but does not limit the amount of credit to be extended to the principal debtor, the guarantor is not discharged because the creditor has extended credit to the principal in excess of the amount of the guaranty. A guaranty merely providing that the guarantor shall not be liable except for a certain sum is construed as a limitation of the guarantor's liability, not as a limitation of the amount of credit." 12 R. C. L., p. 1084, sec. 35, citing Carson v. Hurst, 137 Ga. 640, Anno. Cas. 1913-A, 1086, and note page 1090.

(b) The appellants complain that the Mill Company did not notify them, prior to the time the assets of the Grocery Company were turned over to the creditors' committee, that the Grocery Company had made default in the payment of its account due the Mill Company within the line of credit guaranteed by the appellants. They claim that the failure of the Mill Company to give such notice operated to the injury and prejudice of the guarantors and discharged them from any and all obligations under the guaranty.

We see nothing in the situation which demanded such notice. There was no obligation resting on the Mill Company to notify the guarantors of the state of the account of the Grocery Company

so long as the Grocery Company was a going concern and the account was active. "A continuing guaranty is one which is not limited to a particular transaction or specific transactions, but which is intended to cover future transactions until revoked," and "though the amount is limited, where a course of future dealings is contemplated, the instrument will be held·to be a continuing one up to the amount limited. If the guarantor desires to limit his responsibility to a single transaction or several specific transactions, not exceeding in all a certain sum, it is as easy to limit the element of time as that of amount. Where a limitation is put on the one without being placed on the other, a fair inference arises that it was not the intention of the parties that the contract should be so narrowed in scope." Stearns v. Jones, supra, p. 591.

(c) Appellants insist that the agreement of the Grocery Company on March 7, 1923, to turn over all its assets to the "creditors' committee" for the purpose of liquidation was a "new contract" which relieved them from further liability as guarantors.

The assets of the Grocery Company were turned over to the creditors' committee pursuant to a "blanket resolution" adopted by the Board of Directors of the Grocery Company authorizing T. G. Parham and E. A. Lindsey to make sale of the assets of the Grocery Company and liquidate its business to the best of their ability and as their best judgment directed. It is not claimed that Messrs. Parham and Lindsey could have exercised the authority thus vested in them in any way or manner which would have better conserved the assets of the Grocery Company. The appellants, as stockholders of the Grocery Company, must be held to have authorized this action of the Board of Directors of the Grocery Company. Certainly they acquiesced therein without protest. They were not prejudiced thereby, and are not in a position to complain on that ground.

3. When the assets of the Grocery Company were turned over to the "creditors' committee" the total indebtedness of the Grocery Company to the Mill Company was $22,502.17. The creditors' committee paid to the Mill Company, as its "pro rata" of the assets of the Grocery Company, $14,518.36.

Through its bill in the chancery court, the Mill Company insisted that it had the right to apply the sum thus received by it "first, to those portions of the account for which it had no guarantee, viz.: the first $10,000 and the last $2502.17," and then apply the remainder of its "dividends" ($2,016.19) to the payment pro tanto of "that portion of the account covered by the guarantee," thus leaving a balance of $7,983.81 for which it sought a judgment against the defendants as guarantors.

On the other hand, the defendants insisted below that, if the court should hold them bound as guarantors by the terms of the letter of March 7, 1922, the sums received by the Mill Company from the creditors' committee should be first applied to the satisfaction of the $10,000 guaranteed by them, and the remainder applied as a payment pro tanto on the unsecured portions of the account, but, defendants said further in their answer, that if they were mistaken in their contention that the secured portion of the account must be first paid, then they would "insist that said accounts should have been paid ratably, that is, the secured and unsecured portions of said account should have been extinguished ratably."

The Chancellor did not concur in either of the contentions above set forth. It will be recalled that his conclusion, with respect to this feature of the case, is stated in his written opinion as follows:

"It is therefore the opinion of the court that if defendants are liable to complainant, the amount of their liability is to be estimated as follows:

"The total indebtedness is $22,502.17. This is composed of $10,000 unsecured indebtedness, $10,000 of secured indebtedness and $2,502.17 of unsecured indebtedness. The amount paid on these various items was $14,518.36. The proper method of applying this credit on the indebtedness is to take $10,000 of it and apply it in payment of the first $10,000 or the unsecured $10,000. This leaves $4,518.36 to be applied on the $10,000 of secured indebtedness, which, being deducted from said $10,000 leaves $5,481.64. There is nothing to be applied on the $2,502.17 and complainant loses this."

Through their assignments of error, brief and argument, the appellants insist that the Chancellor's opinion just quoted and his decree in accordance therewith are erroneous and should be reversed. The Mill Company did not appeal, but acquiesced in the Chancellor's decree and now insists that it should be affirmed.

At this point it is well that we dispose of a question made by appellants' assignments of error to the effect that the Chancellor erred in holding that the parties on both sides had "given their construction" of the guaranty contract (with respect to the manner in which payments were to be applied), and that "this construction by each one agrees with that given the instrument by the other."

The Chancellor expressly bases this finding upon an excerpt from the deposition of E. A. Lindsey, one of the guarantors, and an excerpt from the letter of the Mill Company to E. A. Lindsey under date of July 6, 1923, both of which excerpts are copied into the Chancellor's opinion, supra, and need not be repeated.

Our investigation of the record has led us to a different conclusion from that expressed by the learned Chancellor on the point

just mentioned. In the first place, the testimony of Mr. Lindsey quoted in the Chancellor's opinion and the aforesaid letter of the Mill Company written on July 6, 1923, were directed to different subjects; that is to say, said testimony of Mr. Lindsey had reference to "current payments" made on the running account prior to the liquidation of the Grocery Company (which is apparent from the question immediately preceding it and the questions immediately following the quoted testimony), whereas the Mill Company's letter of July 6, 1923, related altogether to the application of the payments made by the creditors' committee to the Mill Company after, or in the process of, the liquidation of the Grocery Company.

Moreover, that part of the testimony of Mr. Lindsey quoted in the Chancellor's opinion (which was given on cross-examination) should be read in connection with his testimony on the same subject given on re-examination, as follows:

"Q. Now, you spoke in one of your answers to the method or order of the application by the Mountain City Mill Company of payments made or to be made to it by the Grocery Company, and as I understood your answer, which was taken down in shorthand and which I cannot read and hence cannot quote exactly, I want to ask you to make that clear now, just what you did mean by your understanding of the application of payments, and I direct your attention to the proposition as to whether payments were to be made on the secured or unsecured part of the account owing by the Grocery Company to the Mill Company? A. Well, if I understand correctly what you are getting at, my answer is, that under no kind of circumstances would I have agreed to any arrangement of any sort, kind or character which did not contemplate carrying into effect actually the details of this guaranty which I signed, which means that we were to get a line of credit of $10,000 unsecured first, and then our security was to apply to the other $10,000 over and above the $10,000 which it was agreed would be granted to us without security. Naturally any payments made would be compelled to be made on that part of the debt which was secured first, or we would get no benefits out of the agreement which we entered into with the Mountain City Mill Company.

"Judge Higgins: Answer objected to, for the reason that it involves an understanding and a conclusion.

"Mr. Roberts: Q. To illustrate the point, Mr. Lindsey, get this concrete state of facts in your mind and then answer it with that in mind. Suppose that the Grocery Company was owing the Mill Company exactly $20,000 which, as you have

stated, would represent $10,000 straight line and $10,000 secured, after, of course, this guaranty had been accepted and was accepted, and then suppose that the Grocery Company made a payment of $500 to the Mill Company; was that $500 to be applied on the secured or on the unsecured $10,000 that was due the Mill Company? A. Well, my understanding is that they would have to apply that $500 to the secured part.

"Objected to by complainant as a conclusion.

"Q. · Now, why do you understand that? Explain how that is, now, just what you had in your mind to say? A. Now, if that had not been done—and I understand it was not done—if they arbitrarily took that money and applied it to the unsecured part, we would have been placed at a very great disadvantage, because we would have been going security on a credit for $20,000, when we were only asked and agreed to go security for $10,000.

"Q. That is exactly what I wanted to get at. Now, was there ever at any time any understanding between you and the Mill Company or any of the other stockholders and the Mill Company as far as you know, contrary to what you have just stated or different from that agreement of March 7, 1922? A. Never at any time, so far as I am concerned, and never at any time in so far as I have any knowledge with reference to the other stockholders.

"Q. At any time before the Grocery Company went out of business and began liquidation on March 7, 1923, did you ever have any notice or even any intimation from the Mill Company that it was making or attempting to make any such application of payments made to it as it now undertakes to make? A. The answer is no; and had I had any such information as that I would have immediately objected."

But neither the aforesaid testimony of Mr. Lindsey nor the letter of July 6, 1923, affords any evidence of a "practical construction" of the guaranty contract by the parties thereto within the rule that "when a contract is ambiguous in its terms, a construction given to it by the parties thereto and by their actions thereunder, before any controversy has arisen as to its meaning, with knowledge of its terms, is entitled to great weight, and will, when reasonable, be adopted and enforced by the courts." This rule is limited to the acts and conduct of the parties before any controversy has arisen between them (2 Elliott on Contracts, sections 1537-1538), and (if the contract here in question could be held to be ambiguous) we find no evidence in the record of a "practical construction" of the contract by the parties upon which a decree could be based.

The ultimate question for decision here is, whether the learned Chancellor correctly construed the guaranty contract in its application to the facts of the case. We agree with the Chancellor that the ordinary rules governing the application of payments as between the principal debtor and creditor are not controlling in this case, and there is, therefore, no occasion for us to discuss the numerous authorities on that subject cited in the briefs of counsel. This is for the reason that the extent of the obligation of the guarantors must be determined by the terms of the guaranty contract as applied to the status at the time their liability became fixed. The guaranty being a "continuing" one, the potential liability of the guarantors fluctuated so long as the account in question was active, and, so far as appears, it was an active or running account practi. cally until the meeting of the creditors of the Grocery Company and the appointment of the creditors' committee on March 7, 1923, with power to liquidate the assets and distribute them ratably among all the creditors of the Grocery Company.

The voluntary act of the Grocery Company in surrendering all its assets to the creditors' committee for the purpose of ratable distribution thereof among its creditors and the permanent cessation of its business and the exercise of its franchises was a confession of insolvency, and, under the settled law of this State, its assets became, from that time, a trust fund for equal distribution among its creditors. Mechanics' Bank & Trust Co. v. Knoxville, S. & E. Railway Co., 148 Tenn., 113, 123, 251 S. W., 906; Voightman v. Railway Co., 123 Tenn., 452, 457, 131 S. W., 982; Memphis Barrel Etc. Co. v. Ward, 99 Tenn., 172, 176, 42 S. W., 13; Tradesman Publishing Co. v. Car Wheel Co., 95 Tenn., 634, 644, 32 S. W., 1097.

When the assured insolvency of the Grocery Company thus supervened, the Grocery Company was indebted to the Mill Company, on open account, to the amount of $22,502.17. As between the Mill Company and the Grocery Company this was a single account—simply the unpaid balance of what had been, until that time, a running account. But, as between the Mill Company and the guarantors, it was, by virtue of the guaranty contract, segregated into three separate debts, viz: (1) $10,000 unsecured; (2) $10,000 secured by the guaranty, and (3) $2,502.17 unsecured. On each of these three debts, treated separately, the Mill Company was entitled to its ratable share of the assets of the Grocery Company, which, in the aggregate, amounted, of course, to the same sum as the Mill Company's ratable share of its total account of $22,502.17, viz.: $14,518.36. This was about sixty-four and one-half per cent of its total debt, or, to be more exact, sixty-four and fifty-two-hundredths per cent. Some of the witnesses stated, in a general way,

that the creditors of the Grocery Company received about sixty-seven per cent of their debts, but it is shown, without dispute, that the Mill Company received only $14,518.36, and a simple calculation shows that this is only sixty-four and fifty-two-hundredths per cent of $22,502.17.

The decree of the Chancellor does not, in our opinion, give effect to all the terms of the guaranty contract. The real inquiry is the intention of the parties, and, to ascertain this, the words of the guaranty must be taken in their plain and obvious sense, and construed in the light of the surrounding circumstances. See Note 39 L. R. A. (N. S.), p. 733, and cases there cited.

And all the provisions of the contract must be given effect.

"The contract must be viewed from beginning to end and all its terms must pass in review; for one clause may modify, limit, or illuminate the other. Taking its words in their ordinary and usual meaning, no substantive clause must be allowed to perish by construction, unless insurmountable obstacles stand in the way of any other course. Seeming contradictions must be harmonized if that course is reasonably possible. Each of its provisions must be considered in connection with the others, and, if possible, effect must be given to all. A construction which entirely neutralizes one provision should not be adopted if the contract is susceptible of another which gives effect to all of its provisions. The courts will look to the entire instrument, and, if possible, give such construction that each clause shall have some effect, and perform some office." 6 Ruling Case Law, p. 838, sec. 227.

Laying aside that part of the "dividend" received by the Mill Company on the excess of $2,502.17 of its account above $20,000, the result of the Chancellor's ruling with respect to the application of the $14,518.36 paid by the creditors' committee to the Mill Company is the same as if the appellants had simply undertaken to indemnify the Mill Company against loss in selling the Parham-Lindsey Grocery Company to the extent of $20,000. This construction ignores the significant terms of the contract which expressly limit the guaranty to $10,000, and further limit it to $10,000 "over and above the $10,000 straight line of credit" which is to be extended to the Grocery Company by the Mill Company "without any guarantee."

It is only by treating the account of the Mill Company against the Grocery Company as segregated into three separate debts, in the manner before stated, that the manifest intention of the parties to the guaranty contract can be effectuated in the circumstances that have arisen. This is a case of a guaranty of a limited part of a debt, and not a guaranty of any ultimate balance that may

remain unpaid upon the dealings between the principal debtor and the creditor. This distinction is pointed out in the case of Dumont v. Fry, 14 Fed., 293, 295, wherein the court said:

"But the question here depends, not upon the law of the appropriation of payments, but upon the effect of the agreement between the sureties and the creditors. If Cavaroc & Son had become sureties for $100,000 of any advance that Schuchardt & Sons should make to the New. Orleans National Banking Association, and the Schuchardts had advanced $200,000, it would be plain, upon authority, that the dividend earned by the whole advance should be applied ratably. As between the surety and the creditors that would be a case where the latter held two distinct demands, and a dividend arising from one of them could not be applied to the other without diverting it from its proper fund. But here the Cavarocs agreed with the Schuchardts that the latter might advance any sum they might see fit to the New Orleans National Banking Association, and that the Cavarocs' bonds, to the extent of $100,000. should be security for any unpaid balance of the advances. The law can make no application of the payments received on account of the advances contrary to the agreement between the parties; and, as it was agreed that the Cavarocs should be sureties to the extent of $100,000 for any unpaid balance arising between the primary parties, the general doctrines of the appropriation of payments cannot be invoked to defeat the agreement. A careful reading of the English authorities supports this conclusion. The result is determined by the character of the undertaking of the surety in each case. Ex parte Hope, 3 Montagu, D. & D. 720; Midland Banking Co. v. Chambers, 38 Law J. Ch. 478.

"As is held in Ellis v. Emanuel, 1 L. R. Exch. Div. 157, 'it is a question of construction on which the court is to say whether the intention was to guarantee the whole debt, with a limitation on the liability of the surety, or to guarantee a part of the debt only.'

"In Hobson v. Bass, 6 L. R. Ch. App. 792, the undertaking of the surety was construed as though it read: 'I guarantee the payment of all goods supplied, but my liability is not to be increased by their amount exceeding £250.'

"In Ex parte Rushforth, 10 Ves. Jr. 409, the same interpretation, substantially, was placed on the undertaking of the surety.

"In Paley v. Field, 12 Ves. Jr. 434, the engagement of the surety recited the intention of the parties to be that the bank-

ers should not be indemnified by the surety for any loss which they should sustain by giving credit to the principal debtor beyond the sum of £1,500. The master of the rolls says: 'The instrument marks distinctly that the sum for which the surety was to be answerable was as against him to be considered as the whole amount of the creditor's demand.' Bardwell v. Lydall, 5 Moore & P., 327, is decided on the authority of Paley v. Field, but upon the facts cannot be reconciled with it, the guaranty being to secure a running balance of account.

"In Raikes v. Todd, 8 Adol. & E., 846, and in Thornton v. McKewan, 1 Hem. & M., 525, the guarantee was to hold the plaintiff harmless for advancing a specified sum to the debtor from time to time, as he might require. In Gee v. Pack, 33 Law J. (N. S.) 49, a note was pledged as security to repay an advance of £300 'now or hereafter to be made' on a banking account with a third person. Coburn, C. J., holds that the 'document amounts to a promise to be liable for an advance to the extent of £300,' and 'not a general promise to pay £300 on any balance, however arrived at, or that may remain due on a general advance to the principal.'

"In all these cases an advance was made in excess of the sum guaranteed, and upon the debtors becoming insolvent the creditor received a dividend on the whole advance, and it was held that the dividend was to be applied ratably on the secured and unsecured portion of the whole demand. They all proceed upon the distinction that the surety had guaranteed a limited part of a debt, and not the unpaid balance of a debt, with a limitation as to the amount of liability,—a distinction which seems subtle, but which rests on the supposed intention of the parties. In a guaranty of a limited part of a debt the parties to it do not contemplate, as between themselves, any augmentation of the debt. Whatever is paid, therefore, as a dividend arising from that part of the debt must be applied to discharge that portion. As between the surety and creditor it is as though no other debt were held by the creditor against the debtor."

It results from our views of the case as herein stated, that the appellants' assignments of error, insofar as they complain of the manner in which the payments made by the creditors' committee were applied by the Chancellor and of the amount of the recovery granted by the chancery court, viz.: $5,481.64, and insofar as they complain of the ruling of the Chancellor that the appellants and appellee had placed the same construction on the guaranty contract, are sustained, but the remainder of the assignments of error are overruled.

We are of the opinion that $6,452 out of the "dividends" received by the Mill Company from the creditors' committee should be applied to the satisfaction pro tanto of the $10,000 of the Grocery Company's indebtedness to the Mill Company guaranteed by the appellants, and that appellants are liable, as guarantors, for the remainder of said $10,000, viz.: $3,548.

The decree of the chancery court will therefore be modified accordingly, and a decree will be entered here granting a recovery in favor of the complainant Mill Company and against the appellants, and the surety on their appeal bond, for the sum of $3,548, with interest thereon from the date of the filing of the bill in this case, viz.: September 5, 1924.

The costs of the chancery court will remain as adjudged by the Chancellor. The costs of the appeal will be divided—one-half to be paid by appellants for which judgment will be entered against appellants and the surety on their appeal bond, and for the remaining one-half of the costs of appeal judgment will be entered against appellee Mill Company.

Crownover and DeWitt, JJ., concur.